# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## KA 03-1601


STATE OF LOUISIANA

VERSUS

GARY LOUIS ANDERSON


**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 262688
HONORABLE DONALD THADDEUS JOHNSON, DISTRICT JUDGE

**********

## BILLY HOWARD EZELL
## JUDGE

**********

Court composed of Oswald A. Decuir, Jimmie C. Peters, and Billy Howard Ezell, Judges.

**CONVICTION AFFIRMED; REMANDED WITH INSTRUCTIONS.**


**James C. Downs**
**District Attorney - 9th Judicial District Court**
**701 Murray Street**
**Alexandria, LA 71301**
**(318) 473-6650**
**Counsel for: Plaintiff/Appellee**
**State of Louisiana**

**Michael W. Shannon**
**Assistant District Attorney**
**Post Office Drawer 1472**
**Alexandria, Louisiana 71309**
**Counsel For Plaintiff/Appellee**
**State of Louisiana**

**G. Paul Marx**
**Attorney at Law**
**P. O. Box 82389**
**Lafayette, LA 70598-2389**
**(337) 237-2537**
**Counsel for: Defendant/Appellant**
**Gary Louis Anderson**

**Gary Louis Anderson**
**Avoyelles Parish Prison**
**675 Government St.**
**Marksville, LA 71351**

**EZELL, JUDGE.**

The Defendant, Gary Anderson, was charged by bill of indictment with second degree murder in violation of La.R.S. 14:30.1. After a bench trial, the Defendant was found guilty of manslaughter in violation of La.R.S. 14:31. On August 12, 2002, the Defendant was sentenced to fifteen years at hard labor. He contends the evidence was insufficient to convict him of manslaughter.

## FACTS

On July 27, 2001, a street fight erupted between the seventeen-year-old Defendant and T.G., the fifteen-year-old victim.[1] The victim was stabbed twice during the brief fight and later died at a local hospital.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by the court for errors patent on the face of the record. After reviewing the record, we find there is one error patent.

Although the minutes of sentencing indicate the trial court advised the Defendant that he had "two years to file for Post Conviction Relief," the transcript of sentencing indicates the trial court erroneously informed the Defendant that he had two years from the date of sentencing to apply for post-conviction relief. The trial court stated, "[Y]ou have two years to apply for any post-conviction relief after this sentence becomes final on this date, pursuant from this date." "Pursuant to La.Code Crim.P. art. 930.8, the prescriptive period for filing post-conviction relief . . . begins to run when the judgment of conviction and sentence become final." *State v. Jones*, 01-539, p. 2 (La.App. 3 Cir. 10/31/01), 799 So.2d 772, 775, *writ denied*, 02-3310 (La. 12/13/02), 831 So.2d 975. Thus, we find the trial court should be directed to inform

---

[1] Pursuant to La.R.S. 46:1844(W)(1)(a), we have used the minor crime victim's initials throughout this memorandum.

1

the Defendant of the correct provisions of Article 930.8 by sending appropriate written notice to the Defendant within ten days of the rendition of this opinion and to file written proof that the Defendant received the notice in the record of the proceedings.

## ASSIGNMENT OF ERROR

The Defendant contends the evidence presented at trial was insufficient to convict him of manslaughter because the victim was the aggressor and the homicide was justifiable.

At trial, Roschund Swain testified he was the best friend of the victim. He stated he lived near both the Defendant and victim his entire life and they all played sports together. He testified that the day before the stabbing there was an argument between the victim and Dante Sikes. Roschund stated the fight started when the victim approached Sikes and asked him what he had said about him. Roschund admitted that the victim threw the first punch at Sikes. Roschund testified as follows:

> A. At that time. It wasn't really a fight. But, like, like, they exchanged punches, but it wasn't really just a big fight. Because soon as they exchanged punches, Gary [the Defendant] had, like, jumped in and pushed [T.]. And he was, like, "Fight me, instead of the dude, Dante." That was the day before.

He stated that nothing happened between the Defendant and victim at that time.

Roschund testified that on the following night, he, the victim, and three other friends were sitting outside when the Defendant and his brothers and friends walked down the street and stopped in front of them. Roschund stated they all got up and walked to the curb to meet them. He estimated there were about twenty people at the scene. One of the guys with the Defendant said "Do what you do." At that point everyone backed up because the Defendant and the victim were getting ready to fight.

Roschund testified about the fight:

Q     Who started fighting?

2

A    [T.] and Gary.  But it wasn't really a fight.  Because [T.], like, swung a blow at him, like, one or two blows.  And while he did, like, he -- he had his little hand down . . .

Q    He--he--

A    . . . here by his pocket -- well, Gary --

Q    Well, when you said, "He had his little hand down," who?  Who?

A    Gary had his hand down by his pocket, and one of his fists up, like this (Demonstrating), but he never swung.  As soon as --

Q    You're indicating he's holding up his left fist, and his right's hand down.

A    Yeah, his right hand was down.

Q    Okay.  And --

EXAMINATION BY COURT

Q    And did you say [T.] swung at -- at the defendant?  That [T.] swung at Gary?

A    Yes, sir.

Q    Okay. Go ahead.

A    And, like, when he was, like -- like, when they was, like, fixing to do it, like, fight, he was like -- it seemed like he waited till [T.] got close to him.  And, like, when they got close, he just stabbed him.

Q    Okay, did you see him actually stab the defendant?

A    Yes, sir.

Q    What did you see in his hand?

A    I seen a knife in a little -- it was wrapped up in a little white towel.

Roschund testified the victim said "He stabbed me," and ran off.  Then the Defendant told him to "come on" and he saw the knife in his hand.

Roschund stated that he had seen the Defendant pull out the knife from his right front pants pocket.  He said the Defendant and the victim were standing very close to one another when the stabbing occurred.  He said the Defendant just had to reach out

3

of his pocket and stab him.

Roschund explained that he did not expect a weapon to be used in the fight. He testified that everyone at the scene that night knew each other, played ball together every day, and had disagreements. Roschund testified that the only person beside the Defendant who had a knife at the time of the fight was the Defendant's brother, William. He stated he did not see William with a knife, but after the victim was stabbed William told him he had a knife and would stab him if he started something.

Roschund Swain's older brother, Desmond Vernon Swain, testified that he is a Southern University student who grew up playing ball with the victim and Defendant. Just before the stabbing occurred, Roschund told Desmond not to leave as the Defendant and his group were coming down the street. Desmond saw the two groups of boys in a circle with the Defendant and the victim in the middle fighting. Desmond testified that after a few punches, the victim stepped back and said the Defendant stabbed him. Desmond stated Roschund yelled at the Defendant and the Defendant and his brother then threatened to stab Roschund. He stated he was surprised by the stabbing because the two boys knew each other and did not have any great animosity toward each other.

On cross-examination, Desmond stated he did not see the Defendant stab the victim, but did see the Defendant holding a bloody knife afterward. He described the knife as having about a six-inch blade with the handle wrapped in a towel. Desmond was shown the knife in evidence (J-1) and he stated it looked like the knife the Defendant was holding.

Kerrell Dunbar testified he was a friend of the victim and knew the Defendant. He testified: "Well, we was in the street, and they met up with each other. And, then,

4

[T.] walked up to Gary, and he threw a lick, and he raised up and said he stabbed him." Dunbar testified he heard the victim say he was stabbed and saw the Defendant with a knife wrapped in a white rag. He stated he assumed the Defendant dropped the knife because he did not see him with it after the stabbing. He also stated the Defendant's brother said he would stab someone too.

Lonnie Murray testified he witnessed the fight as follows:

> So, "later on" came. I happened to be in the neighborhood around there. [T.] was with us, and Gary and his brothers walked up. And Gary asked him, "What's up? What you going to do, now?" So [T.], they both went in the middle of the street, and they start fighting. [T.] swung. Gary swung. It was about three or four licks passed, and [T.] broke out running. And everybody was, like, "Man, what's wrong with you?" And he said, "He stabbed me." And when I looked at Gary, I seen the knife in his hand. And all the rest of them was, like, all his brothers, Gary's brothers was, like, "Y'all come on. Y'all can get stabbed, too." So.

He testified that he did not see the Defendant stab the victim.

Murray testified there was no one else close enough to have stabbed the victim other than the Defendant. He stated the fight between the kids was ordinary and he did not think the Defendant was in such danger that he had to use deadly force to protect himself. Murray stated that the two were going to fight earlier that day, but the Defendant said to wait until later because he was high. Murray testified he told this to the police when he gave his statement, but when given a copy of his statement, he could not find a mention of it. Murray also stated he was surprised by the stabbing and did not see the knife in the Defendant's hand until after the victim was stabbed. He stated he saw the Defendant's two brothers with knives after the fight. He stated he told police the Defendant had five guys with him and they all had knives. Murray testified that he meant the majority of them had knives.

Dominique Teasley testified he saw the brief fight. He stated only a few

5

punches were thrown and the victim ran off saying "This nigger stabbing me." Teasley testified that at the time of the stabbing no one but the Defendant was close enough to the victim to have stabbed him. He did not see the knife during the fight. After the stabbing, the Defendant told Roschund Swain to "come on" as he held the knife. The Defendant's brother, William, acted like he had a knife as well.

Khalilah Ferrell testified that she did not see the stabbing, but after the stabbing she saw the Defendant standing and holding a knife behind his back leg. She stated the Defendant's hand was covering the black handle of the knife, and he looked like he was going to swing the knife. She stated she was about five to ten feet away from him at the time. She stated she never saw the victim with a knife.

Mr. Ronnie Dunbar, father of Kerrell Dunbar, testified that he was standing in his yard when the victim came walking toward him. The victim said, "That nigger stabbed me." When Mr. Dunbar saw blood on the victim's shirt, he ran to him, saw the wound and immediately took him to the hospital. Later, he flagged down an officer and brought him to the crime scene.

Alexandria Police Corporal Farrell Gaspard testified that he was flagged down and told there was a possible gang fight on Felker Street. He arrived at the scene along with Officer Lachney and found several people standing around and blood on the ground. The Defendant's father, Gary Piper, Sr., advised Corporal Farrell that his son was involved in an altercation with another boy. The Defendant was advised of his rights and agreed to cooperate. The Defendant told him that there was a circle of about eight to twelve boys arguing when a fight broke out and somebody got stabbed. Corporal Farrell testified the Defendant did not say who got stabbed, but did say he did not stab the victim. He said he did not know who had stabbed the boy.

Officer Randy Lachney testified that Ronnie Dunbar showed him the bloodstained area and told him he had taken the stabbing victim to the hospital. He

6

was present when the Defendant was advised of his rights. Neither officer noticed any injuries on the Defendant. Officer Lachney corroborated Corporal Farrell's conversation with the Defendant. However, Officer Lachney stated he remembered the Defendant mentioned that he heard gunshots during the altercation, but stated he did not have any weapon on him. We note that neither the Defendant nor the witnesses at the scene indicated that a gun was involved in the altercation.

Detective Cedric Green testified that when he arrived at the crime scene officers were holding the Defendant as a suspect. The Defendant was taken to the police department where he was advised of his rights at 11:00 p.m. The Defendant signed a rights form that was introduced as S-1. The Defendant's transcribed statement was introduced as S-2. In his statement, the Defendant told Detective Green that he was fighting the victim in a crowd when the victim stopped and said someone stabbed him and ran off. The Defendant stated he did not have a knife and did not see anyone else with a knife. Detective Green did not notice any injuries or blood on the Defendant. He testified the Defendant did not complain of any injury during either of his interrogations.

The Defendant was released and arrested later the same night. Detective Green testified he reread the Defendant his rights and questioned him at 3:40 a.m. The rights form was introduced as S-4. The second transcribed statement was introduced as S-5. Detective Green testified as to what the Defendant told him:

> A.      He advised that he did, in fact, have a knife. He had gone into the house, and picked up the knife out of the kitchen because one of the -- one boy had came to his house and told him that -- that -- that [T.] wanted to fight him. So he picked up a knife, and then he went outside.

> Q.      Did he indicate, in that second statement, that had[sic] in fact stabbed the victim, [T.G.]?

> A.      He stated that he, when him and [T.] started fighting, he pulled out the knife, and turned around, and [T.] ran into the knife.

7

The Defendant stated the knife was in his backyard.

After obtaining permission from the Defendant's father, the backyard was searched and the bloody knife recovered. Detective Green testified that they searched the house and did not find a bloody towel or anything else with blood on it.

As a former juvenile detective, Detective Green testified that he did not recall the Defendant being involved in any kind of trouble before this incident. After running a criminal background check, Detective Green stated the Defendant had a prior arrest for a "traffic ticket or something" and another charge for contempt of court.

Sergeant Ronald Beeson, crime scene investigator, testified that he took the photographs of the blood spatters in the road at the scene. He testified that it was not unusual that there were not any blood droplets from the immediate area of the fight until about one hundred feet away. He explained that the blood droplets would depend on what the victim was wearing and the amount of bleeding involved. A search of the street area did not reveal any weapons. Sergeant Beeson testified that he went to the hospital and took photographs of the victim's dead body. He photographed a knife wound to the chest and a small cut on the victim's finger.

After obtaining a search warrant, Sergeant Beeson saw a knife by the sidewalk in the Defendant's backyard. The knife was photographed and collected as evidence. Sergeant Beeson identified J-1 as the knife from the backyard. He stated it had a small amount of blood on it and that he would normally find more blood on a knife used in a stabbing. A swab of the blood was collected and sent to the crime lab for DNA testing. Michelle Gaines of the North Louisiana Criminalist Laboratory testified as a DNA expert that the swabs taken from the bloody knife matched the Defendant and not the victim.

Sergeant Beeson stated he also collected a second knife from under the stereo

in the Defendant's bedroom. Sergeant Beeson testified that both knives had similar handles and appeared to be a matched pair. On cross examination, Sergeant Beeson stated he was not aware of any search for weapons of the bystanders at the scene. He testified that he did not attempt to match the stab wound on the victim to the bloody knife in the Defendant's backyard.

Forensic pathologist George M. McCormick testified the autopsy of the victim revealed he had two stab wounds to the left side of his chest. One wound was superficial, but the fatal stab wound was three-and-one-half inches deep and had entered the heart. Both wounds had one sharp end and one blunt end. McCormick testified the size and shape of the common kitchen knife (J-1) was consistent with the wounds on the victim.

McCormick testified as follows:

Q      Okay. And I understood -- also, doctor, in this case, a number of statements had been introduced that the defendant made shortly after his arrest. And, in one of those statements, the defendant told the arresting officers that he was engaged in a fight or altercation with the victim, and that he pulled a knife. And at the time he pulled the knife, the victim swung at him, and fell into the knife. The defendant, therefore, suggesting this was an accidental stabbing. Is that story, put forth by the defendant, consistent with the wounds you found?

A      It's possible to do that if the victim swings, turns to his left and falls down. Because the wound goes upward, and from his left to his right.

Q      Uh-huh.

A      So, if he falls forward, it won't do that. If he falls to his right, it won't do that. He's got to fall to his left, and be high enough that his blade can go for approximately three inches up into his chest. He's got to fall . . .

Q      He'd have to swing, and, . . .

A      . . . up and on it.

Q      . . . and falling toward the ground, all the way down, . . .

A      Correct.

9

Q    . . . for that . . .

A    Correct.

Q    . . . to be consistent. But there's, if there's -- is there anything else you found, with the number of wounds, make the scenario given by the defendant unlikely.

A    Well, it's hardly like that someone falls on a knife twice. I mean, which one is first? The shallow one? And then the victim backs up again and falls on the knife the second time?

Q    And harder.

A    And harder. Or he falls on the knife, and gets a fatal stab wound in the heart? And, not having had enough, he backs off, and falls on the wound, on the knife again, making a shallow wound? It's not logical.

Q    Not logical. Not consistent.

A    Not consistent.

On cross-examination, McCormick stated that he would not necessarily expect the knife that caused the wounds to be covered in blood. But, he stated he would expect to find some trace of the victim's DNA on the knife. Assuming the knife the Defendant had that night had no DNA of the victim on it, McCormick concluded that the knife either had been cleaned or was not used in the stabbing. He stated it was possible that someone else stabbed the victim during this fight.

Gary Piper, Sr., the Defendant's father, testified that on the evening in question, he allowed his three sons to walk down to Dante Sikes' house so Sikes could get some clothes and spend the night. He testified his son was wearing maroon Nike shorts and a white T-shirt. The shorts he identified were introduced as D-3. Piper noted the shorts do not have a pocket on them. He stated he thought his son had a towel around his shoulders when he left the house. When he returned, he did not have the towel.

When the Defendant returned to his house, he told his father there were a lot of guys outside trying to jump them. Piper stated he went outside, separated the two

10

groups and sent his sons into the house. He did not see the victim outside. Piper said he heard one boy say that his son, William, had stabbed the victim, and he immediately confronted him. He stated William did not have a knife on him and he explained the only thing he had in his pockets was a pack of cookies. Piper testified that the Defendant never told him that he stabbed the victim or accidentally stabbed him.

On cross-examination, Piper admitted the victim was a good kid and a friend of the Defendant's. He stated he never saw him in any trouble.

The Defendant's older brother, Gary Piper, Jr., testified about the earlier argument between the victim and the Defendant on the day before the stabbing. He said somebody said Sikes was going to fight the victim. He explained what happened:

> A       All right, so, it's, it's me, myself, Gary, Lil' William, and Dante. We were going to shoot basketball. So [T.], [T.] asked Dante, "Did you say you was going to knock me out, or you supposed to have knocked me out?" [T.], I mean, Dante said, "Noh." And then, before we know it, they got into an altercation. And, all of a sudden, they start fighting. And I'm trying to get to it to break it up. But, before I get to it, my little brother grabbed [T.], and pushed him back, you know what I'm saying, and I gets in between of them. And, then, Lil' Gary holding [T.] back, like this. [T.] knocks his arm down, and so they getting in each other face. They having words. So I, I mean, we done separated them. So we go on about our business, and they went about their business. So that was the first altercation.

Piper Jr. testified that as he and the Defendant were breaking up the situation between Sikes and the victim, the Defendant and the victim began arguing. The argument ended without incident. The next morning, the victim was at their house playing a video game. Piper Jr. testified that after he left somebody must have told the victim that the Defendant wanted to fight him. Later that day, the victim asked Piper Jr. if the Defendant wanted to fight him. Piper Jr. stated he told him no, that his brother did not say that. Piper Jr. testified that everything was fine and nothing was supposed to happen.

11

Later that same day, Piper Jr., William King, Sikes, and the Defendant were walking down the street when they saw about fifteen to twenty guys by Dunbar's house. As they passed by on their way home, the victim asked the Defendant if he was ready to fight now. Piper Jr. said he was trying to tell the Defendant to head to the house when the Defendant took off his hat, beads, and towel. He stated the Defendant threw the towel on the ground. Piper Jr. testified he was going to let them fight to get it over with. The two "squared up" to fight, and a large crowd gathered around them in the street. Piper Jr. stated the two fought for about twenty seconds and suddenly the victim ran off and everyone said he had been stabbed. He testified he did not see the Defendant with a knife, nor did he see him stab the victim. Piper Jr. testified the Defendant was wearing a white T-shirt and maroon shorts.

On cross-examination, Piper Jr. stated that when the victim and the Defendant fought there was no one else within arms' length of the victim. He testified the rest of the crowd was standing about twelve to fifteen feet away. He testified that he had never seen the two knives that were recovered from his house.

William King, the Defendant's other brother, testified that he saw the fight and heard the victim say he was stabbed, but he did not see the stabbing. He testified he did not see the Defendant with a knife. King testified that after the stabbing, Roschund wanted to fight him so he reached into his pocket and pulled out a pack of cookies. He testified he told Roschund "If you think I got a knife, you can come on and run up, I'll cut you." He described the scene as mass confusion, with other fights going on as well.

On cross-examination, King stated both he and Sikes were standing near the Defendant during the fight. He testified the rest of the crowd was about ten to twelve feet away. King testified the Defendant told him he thought he stabbed the victim and killed him.

12

The Defendant testified that he had a knife the night of the stabbing. The Defendant had been at Sikes' house; when he left, he had a knife, plate, and fork he was taking home with him. On his way home, he encountered the victim who asked him if he wanted to fight. The Defendant testified that he lied and said he was high to avoid the fight. He admitted he had a white hand towel around his neck that night. He had on red Nike shorts, a white T-shirt, a straw hat and beads around his neck. The Defendant said he had the knife and fork in his hand when he was walking down the street. He testified that when he left his yard, he took his hat off, his chain off, and threw the knife down with them. The Defendant stated he and the victim began fighting, with the victim hitting him first. He testified he hit the victim, but did not have anything in his hand. After the victim was stabbed, the Defendant picked up his hat and hurriedly grabbed the knife by the blade and went home. The Defendant testified he nicked his hand and got blood on the knife. He identified J-1 as the knife he had that night. He stated the victim was nearby and told him he was bleeding and it confused him because he saw blood on the knife and had not known at that time that he had cut himself. The Defendant testified he then threw the knife in his backyard. He denied wiping or cleaning the knife. He stated he was not trying to injure the victim in the fight, and thought it would all blow over in a week or two and they would be friends again.

The Defendant stated he originally told police he did not have a knife during the fight. A few hours later he told police the victim fell onto his knife. He testified as follows:

Q    Why did you tell the detective that?

A    Because that was the best scenario I could come up with. He kept on screaming and hollering at me, telling me I had the knife. He said I did stab him. So I made up a story for him. said, "If that's what you want to hear, that's what I'm going to tell you." So I made up him a little story, right fast. And, then, after that -- the only reason I made up a

13

story, from the get-go, is because he told me they was going to charge me with first degree murder. He said, with first degree murder, you cannot get no bond, and, therefore, you got to sit in jailhouse until your court date come.

Q      Okay. And you told him?

A      Yeah, that's when I made up that little story for him.

Q      Okay, what, what story was that?

A      I told him that I had a knife. I told him [T.] hit me in the back of my head, so then I -- I said I had a knife in my hand. And when he, I turned around, he was in a motion of trying to hit me again, and he stabbed himself.

Q      Okay. Did you stab [T.] that night?

A      No, sir. I didn't have the knife in my hand.

Q      Okay. Did you see anyone else stab him?

A      No, sir.

He stated he lied to police because they were yelling at him.

The Defendant testified he told his brother, William, that he did not know what happened. He said he only told him he had a knife, and did not know whether or not he told him that he probably stabbed and killed the victim. The Defendant testified that he did not stab the victim. He stated he did not have the knife in his hand when the fight began. The Defendant testified that the only other person near enough to stab the victim was Sikes. He also denied threatening anyone after the fight.

The Defendant has requested a sufficiency review, contending the evidence established the defense of justification.

In considering questions of sufficiency of the evidence, a reviewing court must consider the evidence presented in the light most favorable to the prosecution and consider whether a rational trier of fact could have concluded that the essential elements of the offense were proven beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The reviewing court defers to rational credibility and evidentiary determinations of the trier of fact. *State v. Marcantel*, 00-1629 (La. 4/3/02), 815 So.2d 50.

14

*State v. Chesson*, 03-606, p. 5 (La.App. 3 Cir. 10/1/03), 856 So.2d 166, 172, *writ denied*, 03-2913 (La. 2/13/04),867 So.2d 686.

The Defendant was charged with second degree murder, but the trial court found him guilty of manslaughter. Louisiana Revised Statutes 14:31 provides, in pertinent part:

> A. Manslaughter is:
>
> (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or
>
> (2) A homicide committed, without any intent to cause death or great bodily harm.
>
> (a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person; or
>
> The trial court found the Defendant guilty, stating:
>
> The overwhelming evidence is here. And it indicates that Gary Anderson stabbed and killed [T.G.]. I can't see it any other way. It is unreasonable to assume anything else. And, as the trier of fact in this case, I have been shown beyond a reasonable doubt that that's what took place. And I do believe that this was cooking a long time. This was cooking all that day, for sure. And it was almost inevitable that [T.] and Gary were going to meet. And like someone testified they said, "We might as well go ahead and get it over with." The problem is, rather than a fist fight, someone was armed with a dangerous weapon.
>
> And it is this Court's belief, based upon the overwhelming evidence that was presented here, today, Gary Anderson had the knife. Gary Anderson stabbed [T.G.] And, for that reason, I'll ask the defendant to stand.

The trial court pronounced the Defendant guilty of manslaughter.

The Defendant contends that a manslaughter killing could be justified. The Defendant argues that the State had to prove that he did not have to act in self-defense citing La.R.S. 14:20(A)(1) as providing that a killing is justified "by one who

15

reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." The Defendant contends the evidence shows that he had earlier refused to fight, but that the victim threatened him and started the fight by stopping him in the street and punching him. He stated the victim was the aggressor and that he should not have been required to wait for the victim to finish his violent attack upon him.

We note the Defendant infers that he reasonably believed he was in imminent danger of receiving great bodily harm in the fight. However, the Defendant does not argue that killing the victim was necessary to save himself from that danger. The evidence at trial showed the victim provoked the fight and threw the first punch. Despite that, there was no evidence at trial that the stabbing of the victim was justified. Witnesses at the scene described the fight as brief, with only a few punches being thrown before the stabbing occurred. There was no testimony at trial that the victim was armed with a weapon. Four witnesses testified that the victim was not armed with any weapon that night, nor did they know him to carry a weapon. Most significantly, the Defendant denied he stabbed the victim, and therefore, presented no evidence that the stabbing was in self-defense.

We find the trial court clearly chose to believe the testimony of other witnesses over that of the Defendant who denied that he stabbed the victim. The Defendant recanted his pre-trial confession where he had stated the stabbing was an accident when the victim fell into his knife. It is the role of the fact finder to determine witness credibility, and this court should not second-guess those credibility determinations beyond the sufficiency evaluations under the *Jackson* standard of review. We find, based on the evidence presented by the State that a rational trier of fact could have found the State proved the elements of manslaughter beyond a reasonable doubt, and in so doing, that the justification defense did not apply. Accordingly, this assignment

16

lacks merit.

### DECREE

The Defendant's conviction is affirmed. The trial court is directed to inform the Defendant of the correct provisions of Article 930.8 by sending appropriate written notice to the Defendant within ten days of the rendition of this opinion and to file written proof that the Defendant received the notice in the record of the proceedings.

**CONVICTION AFFIRMED; REMANDED WITH INSTRUCTIONS**.